UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LYNETTE W. COLEMAN,

                Plaintiff,                    Civil Action No.
                                        09-CV-11585

vs.

                                        PAUL D. BORMAN
FEDERAL EXPRESS CORPORATION,      UNITED STATES DISTRICT JUDGE

                Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This is a race, sex, and age discrimination and retaliation case brought under Michigan's Elliott-Larsen Civil Rights Act (ELCRA). Plaintiff Lynette W. Coleman is an African-American female who was fifty-two years old when her employment was terminated by Defendant Federal Express Corporation (FedEx). She claims that her employment was terminated based on her race, sex, and age, and that she was retaliated against for expressing opposition to workplace discrimination. FedEx argues that Coleman has failed to establish a prima facie case of discrimination and retaliation under the ELCRA and that she cannot demonstrate that FedEx's legitimate, nondiscriminatory reason for her termination is pretextual.

Now before the Court is FedEx's Motion for Summary Judgment. The matter is fully briefed and the Court heard oral argument on July 14, 2010. For the reasons that follow, FedEx's motion will be granted.

## II. BACKGROUND[1]

### A.

Coleman is an African-American female. She started working for FedEx as a courier in 1984, *see* Coleman Dep. at 10, 33, and was fifty-two years old at the time of her termination on June 21, 2007. *Id*. at 154; FedEx Ex. A34.

### B.

FedEx has detailed rules and policies governing the conduct of its employees. The following rules and policies are relevant:

1. "All employees are responsible for notifying their manager no later than the next business day if they have been charged, arrested, or indicted for any criminal (felony or misdemeanor) offense. This includes reporting driving violations and accidents . . . . When there is a resulting criminal charge from an accident, all employees must report the charge. "False arrests" must also be reported. Failure to do so may result in disciplinary action, up to and including termination." FedEx Ex. A6.

2. "All . . . drivers must notify their manager in writing of any traffic violation (excluding parking violations), by the next business day and before operating a Federal Express vehicle." FedEx Ex. A10.

3. "[A] driver who loses any privilege to operate a commercial vehicle, or who is disqualified from operating a commercial vehicle, must advise FedEx Express the next business day after receiving notification." FedEx Ex. A12.

4. "[A]ll . . . employees who operate Company vehicles on public roads . . . as a regular part . . . of the job must report: 1. Any DUI/DWI . . . violation in any vehicle in writing to their manager by the next business day and before driving a FedEx Express vehicle . . . . Failure of the employee to provide notification of a DUI/DWI violation to his manager as outlined is subject to discipline up to and including termination." FedEx Ex. A13.

5. "All employees who drive as a regular part of their job whose . . . drivers license becomes invalid . . . must . . . notify their manager the next business day and before operating a Company vehicle. . . . Invalid License Status includes . . . Suspension –

---

[1] The background is gleaned from the evidence attached to the parties' papers.

Temporary denial of the privilege of operating a vehicle.  FedEx Ex. A13.

Coleman was aware of these rules at all relevant times and understood their importance.  *See* Coleman Dep. at 47-48 (acknowledging FedEx's reporting rules); *Id*. at 64-65 (discussing the importance of these rules); FedEx Ex. A5 (acknowledging receipt of employee handbook); FedEx Exs. A10, A12, A16, A18, A20, A33 (acknowledging, at various times throughout Coleman's employment, FedEx's traffic violation reporting rules).

## C.

On August 2, 2002, Coleman received a traffic citation in Redford Township, Michigan, for an expired plate, no proof of insurance, and failure to transfer plate.  *See* FedEx Ex. A16.  Coleman failed to timely pay the fines associated with this citation.  *See* FedEx Ex. A17.  As a result, her driver's license was suspended from October 24, 2002, until May 20, 2003.  Bill Dec. ¶ 10.[2] Coleman testified that she was unaware that her license had been suspended until FedEx management pointed it out to her in July 2003:

> Q:     Do you recall someone telling you that in July of '03 that your
>         license had been suspended?
>
> A:     Yes.  In '03, yes.
>
> Q:     Did you learn about that from somebody at FedEx telling you that?
>
> A:     Yes.
>
> Q:     So someone at FedEx told you, 'Hey, did you know your license was
>         suspended."

---

[2] Michael Bill is FedEx's Senior Safety Specialist.  Bill Decl. ¶ 3.  He is responsible for "ensuring FedEx's compliance with all applicable safety and health regulations through audits, inspections, and investigations, and by communicating and consulting with FedEx management." *Id*. ¶ 4.

A:      Yes.

Q:      And you're saying that at the time . . . you had no idea until someone at FedEx told you.

A:      Yes.

Coleman Dep. at 55-56. Because Coleman was unaware of the suspension, she did not report it to management in violation of FedEx's traffic violation reporting rules, reproduced above. FedEx took disciplinary action against Coleman when it discovered in July 2003 that her license had been suspended effective October 24, 2002, and that Coleman did not report it. Coleman Dep. 56-58. Specifically, on July 30, 2003, FedEx suspended Coleman's employment with pay pending an investigation and, on August 1, 2003, Coleman received a "warning letter," in which Daniel Wisely, Coleman's manager at the time, stated that "further instances of this nature will not be tolerated and may lead to more severe action, up through immediate termination." *See* FedEx Ex. A17. Wisely also advised Coleman of her right to appeal this disciplinary action through FedEx's grievance procedures. *See id.* However, Coleman did not do so. Coleman Dep. at 59.

### D.

On November 9, 2006, Coleman was involved in a car accident while driving her personal vehicle. Coleman Dep. at 69. As described by Coleman:

> I was driving north on Lodge Freeway, which is Highway 10. And I was in the passing lane, near the cement divider of the highway. A car in the middle lane merged into the lane that I was driving in. And the back end of their vehicle clipped and ran into my vehicle . . . , which forced me to lose control of the car and they continued to speed off and did not stop.

*Id.* Coleman called 911 and was "hysterical, crying, [and] sobbing" when the police arrived. *Id.* at 69-70. The police asked Coleman if she had been drinking and Coleman responded that she "had had a drink." *Id.* at 70. The police then administered a sobriety test. *Id.* According to Coleman,

the police officer who conducted the sobriety test told Coleman at the scene that she had passed. *Id.* at 179. After completing the test, the police asked Coleman if she was alright. *Id.* Coleman responded "no" at which time Coleman was taken to the hospital in an ambulance. *Id.* at 71.

While at the hospital, the same officer who administered the sobriety test came to Coleman's bedside and asked if he could take a blood specimen. *Id.*; FedEx Ex. A24 (blood test report). The officer never explained why he wanted the specimen, although he did convey his belief that Coleman was intoxicated. As explained by Coleman:

> Q: The officer . . . explained to you that they were going to be taking blood to check alcohol level. You were aware what was going on there?
>
> A: No. The officer asked me would I give a blood specimen. I agreed. No explanation of why. It was not told to me why. He did state that he thought, perhaps, I was intoxicated, but that was the extent of the questioning or the conversation that the police officer and I had.

Coleman Dep. at 71-72. The officer also confiscated Coleman's driver's license and gave her a temporary license that, according to Coleman, stated that Coleman had agreed to a blood specimen at the hospital. *Id.* at 73-75. The officer told Coleman that he was confiscating her driver's license because he thought that "perhaps . . . [she] was under the influence of alcohol." *Id.* at 74-75. The temporary license is not in evidence because Coleman subsequently lost it. *Id.* at 85-86.

Coleman was released from the hospital that evening, at which time she phoned her manager, Chalmers Sanders,[3] to report the car accident. *Id.* at 79. Coleman told Sanders that she was involved in a hit and run accident but did not mention (1) the sobriety test, (2) the blood specimen, (3) that the police suspected her of drunk driving, (4) that her driver's license had been confiscated,

---

[3] Sanders is also known by the first name "Chaz."

or (5) that she had received a temporary driver's license.  *Id*. at 80-82.

Q:     Did you tell [Sanders] that the police had conducted sobriety tests?

A:     No.

Q:     Did you tell [Sanders] that you had given a blood test at the hospital?

A:     No.

Q:     Did you tell [Sanders] that the police officers had suspected you of drinking alcohol?

A:     No.

Q:     Why did you not tell [Sanders] that information?

A:     I felt that there was no reason to give him that information.  Policy and procedure states that you are to inform your manager of any tickets or violations that you have received.  I – or accidents that you have been involved in.  I informed my manager that I had been in an accident.  There was no citation or ticket or violation issued to me at all.  So that is the reason why I did not tell my manager.  There was only information regarding an accident, which was filed a hit and run.

\* \* \* \*

Q:     Did you tell [Sanders] that you had a temporary [license] or anything, anything about your license?  The fact that you didn't have the actual hard license any longer?

A:     No.  I did not.

*Id*. at 80, 82, 84.  *See also* Sanders Decl. ¶ 5 (testifying that Coleman "did not tell [him] . . . that she had been cited by police as a result of the accident, that the police had taken away her driver's license, or that police had taken a sample of her blood for testing because they suspected her of operating a vehicle while intoxicated").

Unbeknownst to Coleman at the time, the police had issued her a citation for careless driving as a result of the November 9, 2006, accident.  *See* FedEx Ex. A28.  Also unbeknownst to Coleman

at the time, the crash report reflects that Coleman was issued a citation for operating under the influence of liquor (OUIL). *See* FedEx Ex. A25 (crash report). However, no OUIL citation is in evidence.

Coleman testified that she did not learn of the careless driving citation until June 4, 2007. Coleman Dep. at 89, 91. The circumstances under which Coleman came to learn of the citation are as follows. On June 4, 2007, Coleman attempted to purchase an item that required identification, but could not find her temporary license. *Id*. at 90. She went to the Secretary of State to obtain a replacement license, at which time she was told that one could not be issued because her license had been suspended for non-payment of the fine associated with the November 9, 2006, careless driving citation. *Id*. at 90-91. This was the first time that Coleman learned of the citation or the suspension. *Id*. at 91; Coleman Aff. ¶ 7a

The agent at the Secretary of State told Coleman that she could obtain more information regarding the citation by going to the Michigan State Police, the law enforcement agency who issued the ticket. Coleman Dep. at 91. The Michigan State Police furnished a copy of the crash report to Coleman, *see* FedEx Ex. A25 (crash report), but told her that she needed to go to the 36th District Court to obtain further information, including a copy of the citation. Coleman Dep. at 91. Coleman went to the 36th District Court that same day, on June 4, 2007, as instructed, where she was furnished with a copy of the citation. *Id*. Coleman inquired with the court staff about how she would go about setting aside the citation and the suspension and was told that she could file a motion with the court. *Id*. at 92. Coleman filed a motion that day, on June 4, 2007, *see* FedEx Ex. A26 (motion); Coleman Dep. at 92, and supplemented the motion with a handwritten letter the next day, on June 5, 2007. *See* FedEx Ex. A27 (supplementary letter); Coleman Dep. at 95.

During her visit to the 36th District Court and the Michigan State Police Department, Coleman never inquired as to the status of the blood specimen she had been given at the hospital, nor did she ask about her permanent driver's license, which had been confiscated by a police officer at the hospital on the day of the accident. Coleman Dep. 104-105.

Coleman phoned Sanders on June 4, 2007, to apprise him of these events, but got his voicemail. Coleman Dep. at 98. Coleman left a message requesting a call back immediately. *Id*. She did not attempt to call any other managers. *Id*. at 99. Sanders did not call Coleman back on June 4, so Coleman reported to work the next day and spoke to Sanders in person before starting her shift:

> I explained [to Sanders] everything that was going on. I explained to him that I had lost my license. I explained to him going to the Secretary of State and being informed that my license was suspended. I explained to him that I was told that in order to receive any information regarding that accident that happened in November, that I must report to or go to the State of Michigan Police Department to retrieve any information.

*Id*. at 100. Sanders instructed Coleman to "write an explanation of what [she] had just told him," *id*. at 100-101, which Coleman did that day. *See* FedEx Ex. A30 (letter of explanation). Coleman was immediately suspended with pay from her job duties pending an investigation. *See* FedEx Ex. A29 (suspension letter).[4] Because Sanders was away on vacation beginning June 15, 2008, he did not have any further involvement with the investigation of this incident. Sanders Decl. ¶ 8. Instead, FedEx Senior Manager, Mark McCormick, handled the investigation. *Id*.

McCormick consulted with FedEx's Safety Specialist, Michael Bill, and FedEx's Human Resource Representative, Gary Hickman, for guidance. McCormick Decl. ¶ 4. Bill investigated and

---

[4] The suspension letter is incorrectly dated May 8, 2007. *See* Sanders Decl. at ¶ 7. The correct date is June 5, 2007. *Id*.

determined that Coleman's employment with FedEx should be terminated:

> Based on the information gathered during the investigation, including the copy of the police incident report provided by Ms. Coleman that indicated she had been cited for operating a vehicle under the influence of alcohol, I sent an email to Ms. Coleman's management team and HR Representative to summarize the investigation findings so far. . . . Based on those findings, and the fact that this was the second time her license had been suspended and she had failed to report it to FedEx, I recommended terminating Ms. Coleman's employment with FedEx under the Driving Qualifications Policy.

Bill Decl. ¶ 12. The email, referenced above, that Bill sent to Coleman's management team is attached to Bill's declaration as Exhibit 6. This email explains why Coleman's employment with FedEx was terminated. *See also* FedEx Ex. A34 (termination letter). Namely, Coleman operated a FedEx vehicle from March 28, 2007, until June 5, 2007, on a suspended license.

The termination letter explained why Coleman's employment was terminated and advised Coleman of her right to appeal through FedEx's grievance procedures. *See id.* Coleman exhausted all three steps of the grievance procedures to no avail; the decision of management to terminate Coleman's employment was upheld at all three levels. *See* FedEx Exs. A35 (Step I grievance documentation), A36 (Step II grievance documentation), A37 (Step III grievance documentation); Coleman Dep. at 121-129 (discussing grievance procedure). The gist of Coleman's complaint at all three levels was that she was unaware that her license had been suspended or that she had been issued any citation relating to the November 9, 2006, accident until June 4, 2007, when she went to the Secretary of State to obtain a replacement driver's license, and therefore was not at fault for failing to inform her employer:

> The action taken by management was wrongful. First, I never received an OUIL violation; thus, I could not report as such to FedEx management. Secondly, I did not knowingly operate a FedEx vehicle with a suspended license. I did not become aware of the suspension until June 4, 2007 and thereafter, I immediately notified management.

> Lastly, I do not believe management conducted a thorough review of the evidence or my performance history. My MVR report clearly indicates that the careless driving citation was the only one issued to me on November 9, 2006. My pending motion before the 36th District Court demonstrates that I never received notification of this violation. Since I did not receive notice of the citation, I had no reason to believe that my license had been suspended for failure to comply. Therefore, I acted in good faith while driving FedEx vehicles from March 28, 2007 until June 5, 2007.

FedEx Ex. A35 (Coleman's Step I grievance).

As part of the Step I grievance procedure, a meeting was held to discuss Coleman's concerns. *See* FedEx Ex. A35. Coleman, Hickman, and Sanders attended. Coleman Dep. at 122-123. Also present was Walter Mattei, Managing Director of FedEx's Great Lakes Region. *Id.* Coleman testified that she was not permitted to talk freely at the meeting, that she was "cut off by senior management," and "bullied by management." *Id.* at 123-124. She also testified that Mattei "[r]aised his voice, slammed documents and papers on the table," and "left the room for minutes and returned back and was belligerent, loud." *Id.* at 124. Moreover, Coleman stated that Sanders "never spoke up" to defend her at this meeting despite the fact that she had always been a "team player," assisting others who needed help on a daily basis. *Id.* at 133-134.

Coleman was fifty-two years old at the time of her termination on June 21, 2007.

### E.

Coleman retained an attorney to assist her in setting aside the careless driving citation. Coleman Dep. at 181. Her attorney, Loren Dickstein, filed a motion in the 36th District Court to Set Aside Default Judgment.[5] *See* FedEx Ex. A40. On October 26, 2007, the motion was granted because, apparently, the police officer did not appear at the hearing, *see* FedEx Ex. A 28, p. 2. In

---

[5] It is not clear from the record what happened with Coleman's handwritten motion to set aside, which she filed *pro se* on June 4, 2007.

the end, Coleman was never convicted of any driving offense associated with the November 9, 2007, accident.

**F.**

FedEx did not hire a new employee to replace Coleman. Kennedy Decl. ¶ 5.[6] Instead, Kennedy distributed her duties among six existing employees: (1) Cindy Ezzat (Hispanic female then approximately forty-one years old); (2) Keith Ratliff (Caucasian male then approximately fifty-four years old); (3) Kristine Vidojevski (Caucasian female then approximately thirty-two years old); (4) Patricia Williams (African-America female then approximately forty-seven years old); (5) Joseph Brown (African-American male then approximately forty-four years old); and (6) Norman Parmenter (Caucasian male then approximately forty-nine years old). *Id*. ¶ 5.

**G.**

Coleman filled out an Equal Employment Opportunity Commission (EEOC) Intake Questionnaire on March 4, 2008, and filed a Charge of Discrimination on the same date. *See* FedEx Ex. A38 (Intake Questionnaire and Charge of Discrimination).

**H.**

Two remaining facts are relevant for the purposes of the present motion. First, according to Coleman, Sanders occasionally referred to her as "an old lady." Coleman Dep. at 158. Coleman was offended by this comment, but when she brought it to Sanders' attention, he "seemed to be" apologetic. Coleman Dep. at 159. Sanders, on the other hand, testified that he never called Coleman "old," that he "tr[ies] to treat all of [his] employees with respect," and that Coleman never informed

---

[6] At the relevant time in 2007, Michael Kennedy was FedEx's Operations Manager. *Id*. ¶ 3.

him that she was offended by anything he said.  Sanders Decl. ¶ 10.

Second, at one point during her employment with FedEx, Coleman worked for four years on a special assignment as a liaison to United Way.  Coleman Dep. at 166.  Coleman was eventually removed from this special assignment (in 2004 or 2005), a decision that she felt was "unfair."  *Id*. at 168.

## I.

Coleman filed the present lawsuit on April 28, 2009.  The Amended Complaint, which was filed on May 7, 2009, contains age, sex, and race discrimination claims under the ELCRA.  Coleman also alleges that FedEx retaliated against her for opposing the discrimination.  FedEx filed its Motion for Summary Judgment on March 22, 2010.

## III.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(b), a party against whom a claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof."  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id*. at 323.

A fact is "material" for purposes of a motion for summary judgment where proof of that fact

"would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-323. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).

## IV. ANALYSIS

In her Amended Complaint, Coleman advances both a discrimination claim and a retaliation claim under the ELCRA. The Court addresses the discrimination claim first, followed by the

retaliation claim.

## A. Discrimination Claim

Coleman claims that FedEx discriminated against her based on her sex (female), race (African-American), and age (fifty-two at the time of her termination). The ELCRA prohibits an employer from discriminating against an employee because of the employee's sex, race, or age. *See* Mich. Comp. Laws § 37.2202(1)(a). "Proof of discriminatory treatment in violation of the [ELCRA] may be established by direct evidence or by indirect or circumstantial evidence." *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 469 Mich. 124, 132 (2003). As stated by the Michigan Supreme Court,

> [i]n cases involving direct evidence of discrimination, a plaintiff may prove unlawful discrimination in the same manner as a plaintiff would prove any other civil case. We have previously cited with approval the United States Court of Appeals for the Sixth Circuit's definition of direct evidence as evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.

*Id.* at 132-133 (quotation marks and citations omitted). By contrast,

> [i]n cases involving indirect or circumstantial evidence, a plaintiff must proceed by using the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This approach allows "a plaintiff to present a rebuttable prima facie case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination." To establish a rebuttable prima facie case of discrimination, a plaintiff must present evidence that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) her failure to obtain the position occurred under circumstances giving rise to an inference of unlawful discrimination. Once a plaintiff has presented a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If a defendant produces such evidence, the presumption is rebutted, and the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination.

*Id*. at 133-134 (citations and footnote omitted).

In the present case, Coleman contends that there is direct evidence of age discrimination and that the *McDonnell Douglas* burden-shifting framework therefore does not apply to her age discrimination claim. Coleman concedes, however, that there is no direct evidence of race or sex discrimination and the *McDonnell Douglas* burden-shifting framework applies to those claims.

## 1. Direct Evidence

Coleman argues that there is direct evidence of age discrimination because Sanders referred to her as an "old lady."[7] The Court disagrees. Michigan courts, adopting the framework used by the Sixth Circuit in *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir. 1994), assess the relevancy of "stray remarks" in the context of employment discrimination cases by reviewing the following factors:

> (1) Were the disputed remarks made by the decisionmaker or by an agent of the employer uninvolved in the challenged decision? (2) Were the disputed remarks isolated or part of a pattern of biased comments? (3) Were the disputed remarks made close in time or remote from the challenged decision? (4) Were the disputed remarks ambiguous or clearly reflective of discriminatory bias?

*Krohn v. Sedgwick James of Mich., Inc.*, 244 Mich. App. 289, 292 (2001).

In *Krohn*, for example, the Michigan Court of Appeals determined that the trial court properly excluded, as irrelevant to show discriminatory age bias, the statement "out with the old and in with the new," which was made by a supervisor, because (1) the supervisor who made the remark was not involved in the challenged termination decision, (2) the remark was isolated, (3) the remark

---

[7] Sanders denied calling Coleman "old," *see* Sanders Decl. ¶ 10; however, for the purposes of the present motion, the Court construes the facts in the light most favorable to Coleman, the non-moving party. Therefore, Coleman's version of the facts is controlling for the present purposes.

was made more than two years before the plaintiff-employee's termination, and (4) the remark was not reflective of discriminatory bias since it was made when new employees began working for the company and not when older employees were terminated. *Id*. at 301-302.

Applying the *Krohn* framework to the present case, the Court finds that Sanders' alleged "old lady" remark, like the remark "out with the old and in with the new," is irrelevant to show discriminatory age bias. First, and most importantly for the present purposes, Sanders was not involved in the ultimate decision to terminate Coleman. As stated by Sanders:

> Although I was involved in the initial investigation and suspension of Ms. Coleman, I was away from the station on vacation during the week of June 18, 2007 and did not have any further participation in the investigation of Ms. Coleman after I left work to begin my vacation on Friday, June 15, 2007. My Senior Manager, Mark McCormick, would have participated in the investigation in my absence. Upon my return to work from vacation, I learned from Mr. McCormick that Ms. Coleman's employment had been terminated.

Sanders Decl. ¶ 8.

Second, there is nothing to suggest that the remark was "part of a pattern of biased comments" made by Sanders. Although the record does not indicate how many times Sanders allegedly called Coleman an "old lady," Coleman testified that Sanders stopped after she mentioned that it bothered her and that Sanders was "apologetic." Coleman Dep. at 159. Moreover, Coleman does not allege that Sanders made any other discriminatory remarks.

The record is not clear with regard to the third element, whether the "old lady" comment was made close in time to Coleman's termination. Coleman was not asked during her deposition when the comments were allegedly made by Sanders in relation to her termination. In any event, because Sanders was not involved in the ultimate decision to terminate Coleman, any discriminatory bias held by Sanders cannot be imputed to McCormick, Bill, Hickman, Stern, and Mattei, the five senior

management officials who actually made the decision to terminate Coleman's employment. *See* McCormick Decl. ¶ 9.

Finally, Sanders' alleged "old lady" remark is not "clearly reflective of discriminatory bias" inasmuch as Coleman's deposition testimony reflects that Sanders may have been "joking around . . . in conversation." *See* Coleman Dep. at 158. As Coleman herself acknowledges: "who am I to say, 'well, he's just joking. He's not serious.'" *Id*.

Because each element of the *Krohn* framework weighs in FedEx's favor, the Court finds no direct evidence of age discrimination in this case. Therefore, the Court applies the *McDonnell Douglas* framework to Coleman's age discrimination claim. As stated above, Coleman concedes that the *McDonnell Douglas* framework applies to her race and sex discrimination claims.

### 2. Indirect / Circumstantial Evidence

As this Court has previously stated,

> [i]n order to establish a prima facie case of . . . discrimination under the *McDonnell-Douglas* framework, a plaintiff must prove that: (1) she was a member of the protected class; (3) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was (a) replaced by someone outside the protected class, or (b) treated less favorably than similarly-situated persons outside the class.

*Ward v. A-1 Int'l Courier Serv., Inc.*, No. 05-72330, 2007 WL 325342, at *4 (E.D. Mich. Jan. 31, 2007) (unpublished). Only the fourth element is contested in the present case. FedEx argues that Coleman was not "replaced" because her duties were distributed among existing FedEx employees. Coleman does not respond to this argument. FedEx also contends that Coleman was not treated differently than other similarly-situated FedEx employees. Coleman disagrees, and calls FedEx's position on this point "absurd."

### a. Was Coleman "Replaced" By Someone Outside Her Protected Classes?

FedEx is correct that Coleman cannot satisfy the fourth element of the *Ward* framework on a replacement theory. As the Sixth Circuit has held, "[s]preading the former duties of a terminated employee among the remaining employees does not constitute replacement." *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992). Thus, Coleman was not "replaced." In addition, even if Coleman could somehow show that she was "replaced," which she cannot, the Court notes that Coleman's job duties were distributed among individuals who are members of Coleman's three protected classes. Namely, Coleman's job duties were distributed among two African-Americans (Williams and Brown), three females (Ezzat, Vidojevski, and Williams), and one individual who is older than Coleman (Ratliff). *See* Kennedy Decl. ¶ 5. Thus, Coleman's job duties were not assigned to individuals outside her protected classes.

**b. Was Coleman Treated Less Favorably Than Other Similarly-Situated Employees?**

Since Coleman cannot show that she was replaced by someone outside her protected classes, she must demonstrate disparate treatment in order to establish a prima facie case of discrimination. For the reasons that follow, Coleman cannot do so and, accordingly, summary judgment must be granted in favor of FedEx on Coleman's ELCRA discrimination claim.

"In order to prove disparate treatment, the plaintiff must prove that he was within the protected class and that he was treated differently than persons of a different class for the same or similar conduct." *Larson v. First of Am. Bank Corp.*, No. 189717, 1997 WL 33354372, at *2 (Mich. Ct. App. Feb. 7, 1997) (unpublished) (per curiam). Moreover, as stated by the Sixth Circuit and cited with approval by the Michigan Court of Appeals in *Tardy v. Diesel Tech. Co.*, No. 205504, 1998 WL 1989868, at *2 (Mich. Ct. App. Oct. 9, 1998) (unpublished) (per curiam),

to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have [1] dealt with the same supervisor, [2] have been subject to the same standards and [3] have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). FedEx contends that Coleman cannot meet this burden. The Court agrees.

Coleman argues that she was treated more harshly than five of her former co-workers: Brian McTighe, Wayne Lohmeier, Sammy Jimenez, Carlos Rodriguez, and Raymord Haggard. FedEx, on the other hand, argues that Coleman cannot show that she is similarly-situated to any of these individuals because (1) Coleman did not engage in the same conduct as her five former co-workers and (2) the decision to discipline Coleman, on the one hand, and her five co-workers, on the other hand, was made by different FedEx management officials. For the reasons that follow, the Court finds FedEx's first argument persuasive and, accordingly, need not reach its second argument.

### i. Brian McTighe

Coleman states that she was treated less favorably than McTighe, a younger Caucasian male to which Coleman contends she is similarly-situated. However, the Court agrees with FedEx that McTighe did not engage in the same conduct as Coleman. The record reflects that McTighe was charged with operating a vehicle while intoxicated in March 1995. McTighe Decl. ¶ 6. Unlike Coleman, McTighe reported his arrest to FedEx management the next business day. *Id.* He was placed on unpaid personal leave until the charge was resolved. *Id.* While on leave, McTighe applied for and obtained a non-driving position as a FedEx dispatcher. *Id.* He then worked in that position for the next nine years, at which time he obtained an Operations Manager position in January 2004. *Id.*

The fact that McTighe reported his charge to FedEx the next day is alone sufficient to render McTighe's circumstances materially different from those of Coleman. For this reason, McTighe's situation does nothing to advance Coleman's prima facie disparate treatment case.

### ii. Wayne Lohmeier

Like McTighe, Lohmeier is also a Caucasian male who is younger than Coleman. Lohmeier was charged with operating a vehicle while intoxicated in August 2004, and, unlike Coleman, reported the charge to FedEx management immediately and before operating a FedEx vehicle, in accordance with FedEx policy. Bill Decl. ¶ 6. For this reason, Lohmeier, like McTighe, does not serve to advance Coleman's prima facie case.

### iii. Sammy Jimenez

Neither does Jimenez. Jimenez is a younger, male Hispanic who, like McTighe and Lohmeier, is not similarly-situated to Coleman. In March 2006, Jimenez failed to timely renew his driver's license and, as a result, drove a FedEx vehicle on an expired license for three days. Holback Decl. ¶ 8; Sanders Decl. ¶ 4; Bill Decl. ¶ 8. Because Jimenez failed to report the expiration of his license, he was disciplined with a warning letter and a one week disciplinary suspension. Holback Decl. ¶ 8; Bill Decl. ¶ 8, Ex. 2 (email from Bill to Jimenez's management team recommending disciplinary action).

FedEx states in its brief that this was Jimenez's first violation of company policy. As discussed above in Section II(C), Coleman was disciplined similarly for her first violation in July 2003 when she was issued a warning letter and a one week suspension after she drove a FedEx vehicle on an suspended license for several months without notifying FedEx management. As such, the Court agrees with FedEx that it "treated Jimenez and Coleman equally by giving them the same

discipline for their first violations of the Driving Qualifications Policy." FedEx Br. at 12. In fact, because Coleman drove on a suspended license for a much longer period of time than Jimenez drove on an expired license (several months as compared to three days), Jimenez was arguably treated more harshly than Coleman since the two received equal punishment for company violations of unequal severity. Moreover, Coleman's disparate treatment claim is not bolstered by the fact that Jimenez was not terminated after his first violation of FedEx policy while Coleman was terminated for her second violation of FedEx policy; apples to oranges comparisons of this kind are not helpful since Coleman must show that an employee outside her protected class engaged in "the same conduct without [material] differentiating . . . circumstances." *Mitchell*, 964 F.2d at 583. For these reasons, Jimenez's circumstances do not boost Coleman's prima facie case.[8]

### iv. Carlos Rodriguez

Rodriguez, a younger Hispanic male, was issued a warning letter and a five day disciplinary suspension in April 2008 for driving a FedEx vehicle on a suspended license. Holback Decl. ¶ 9, Ex. 2 (letter of explanation written by Rodriguez to Holback, Rodriguez's then-supervisor), Ex. 3 (warning letter issued to Holback); Bill Decl. ¶ 9, Ex. 3 (email from Bill to Rodriguez's management team recommending disciplinary action against Rodriguez). Like the case with Jimenez, FedEx states in its brief that this was Rodriguez's first violation. Thus, Rodriguez's situation does not

---

[8] In her response brief and at oral argument, Coleman contended that FedEx has a formal policy that prohibits it from considering instances of misconduct that are over a year old. At oral argument, the Court invited the parties to submit supplemental briefs addressing FedEx's policy relating to this narrow issue. Both parties have submitted their respective supplemental memoranda. *See* docket entries 27 and 28. In hers, Coleman "concede[s] that she mistakenly believed disciplinary actions had to be removed from one's personnel file after 12 months." Coleman Supp. Br. at 1-2. Thus, no rule prevented FedEx from considering the prior disciplinary action it took against Coleman in 2003 arising out of her August 2, 2002, citation and subsequent license suspension.

evidence disparate treatment for the same reasons as those relating to Jimenez, discussed in the preceding paragraph and in footnote 8.

Moreover, the Court notes that Rodriguez was still disciplined even though FedEx management determined that "there was nothing to indicate that [Rodriguez] had tried to deceive FedEx or cover up the violation or suspension," since "Mr. Rodriguez notified Mr. Holback [of the suspension] upon . . . discovery." Bill Decl. ¶ 9. This shows that FedEx's reporting rules are essentially strict liability policies; FedEx disciplines its drivers for reporting violations even in the absence of fault. Put another way, FedEx drivers have a continuing obligation to keep apprised of the status of their license.

### v. Raymord Haggard

Haggard is a younger, African-American male FedEx courier. In June 2005, FedEx discovered, while conducting an annual review of Haggard's driving history, that his driver's license had been suspended for failure to comply with a traffic citation. McTighe Decl. ¶ 5; Holback Decl. ¶ 5. McTighe and Holback, Haggard's supervisors at the time, placed Haggard on a paid suspension pending FedEx's investigation. McTighe Decl. ¶¶ 4-5; Holback Decl. ¶¶ 4-5. As part of the investigation, McTighe and Holback questioned Haggard, who told them that he was not stopped or cited by police for a moving violation on the date in question. McTighe Decl. ¶ 5; Holback Decl. ¶ 5. Haggard later reported to McTighe and Holback that his cousin had falsely identified himself to the police as "Raymond Haggard" during a traffic stop, and that it was his cousin who actually committed the traffic violation. McTighe Decl. ¶ 5; Holback Decl. ¶ 5. As a result, McTighe and Holback placed Haggard on an unpaid personal leave of absence from his courier position until the issues with his driving record and license could be resolved. McTighe Decl. ¶ 6; Holback Decl. ¶

6. When Haggard produced documentation showing that the traffic citation had been dismissed and that all issues were resolved, he was allowed to return to his courier position.  McTighe Decl. ¶ 6; Holback Decl. ¶ 6.

Unlike Coleman, Haggard did not violate FedEx policy inasmuch as he never actually received a traffic citation; instead, his dishonest and mischievous cousin received the violation and blamed Haggard.  Under these circumstances, Haggard is clearly not similarly-situated to Coleman.

In sum, the Court agrees with FedEx that

> Coleman cannot present any competent evidence that FedEx failed to discharge a younger, non-African American, or male employee who – after being disciplined once before for not following the reporting requirements in FedEx's Driving Qualifications and Acceptable Conduct policies – continued to violate those same policies.

FedEx Br. at 14.  Because Coleman cannot show that she was either "replaced by someone outside [her] protected class[es]" or "treated less favorably than similarly-situated persons outside [her] class[es]," she cannot satisfy the fourth element of the *Ward* framework and, consequently, cannot establish a prima facie case of discrimination under the ELCRA.  FedEx is entitled to summary judgment on Coleman's ELCRA discrimination claim.

## B.  Retaliation Claim

The ELCRA prohibits an employer from "[r]etaliat[ing] or discriminat[ing] against a person because the person has opposed a [ELCRA] violation . . . or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under [the ELCRA]."  *See* Mich. Comp. Laws § 37.2701(a).  To establish a prima facie case of retaliation, a plaintiff must show:

> (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the

plaintiff; and (4) that there was a causal connection between the protected
activity and the adverse employment action.

*Garg v. Macomb County Cmty. Mental Health Servs.*, 472 Mich. 263, 273 (2005).

Coleman claims that FedEx retaliated against her for complaining about workplace

discrimination; namely for telling Sanders that she did not appreciate his "old lady" remarks.[9]

FedEx contends that Coleman cannot satisfy the first, second, and fourth elements of the *Garg*

framework.  Coleman disagrees.  For the reasons that follow, the Court finds that Coleman has not

engaged in protected activity and therefore cannot satisfy the first element of the *Garg* framework.

The Court does not reach the parties' arguments related to elements (2) and (4).

As stated by the Michigan Court of Appeals,

> [a]n employee need not specifically cite the [EL]CRA when making a charge
> under the act.  However, the employee must do more than generally assert
> unfair treatment.  *See Mitan v. Neiman Marcus*, 240 Mich.App. 679, 682, 613
> N.W.2d 415 (2000) (holding complaints amounting to generic claims of "job
> discrimination" did not qualify as a charge made under the Persons with
> Disabilities Act, M.C.L. § 37.1101 *et seq.*; MSA 3.550[101] *et seq.*).  The
> employee's charge must clearly convey to an objective employer that the
> employee is raising the specter of a claim of unlawful discrimination
> pursuant to the [EL]CRA.

*Barrett*, 245 Mich. App. at 318-319.

---

[9] In her deposition, Coleman expressed a belief that she was terminated because she had
complained a few years back about her involuntary removal from her special assignment with
United Way.  *See* Coleman Dep. at 169.  However, in her brief, this is not mentioned as a basis
for the retaliation claim.  Thus, for whatever reason, Coleman has opted not advance this
argument before the Court.  In any event, even had Coleman advanced the argument, the Court
would find it unpersuasive.  Coleman merely complained that her removal was "unfair."  *Id.* at
168.  She cannot recall whether race or age came up in discussion.  *Id.* at 169-170.  As discussed
below, an employee "must do more than generally assert unfair treatment" in order to have
engaged in protected activity.  *See Barrett v. Kirtland Cmty. Coll.*, 245 Mich. App. 306, 319
(2001).  Coleman has not shown that she did anything more than merely complain that the
decision was unfair.  Thus, she has not engaged in protected activity.

Coleman argues that she engaged in protected activity when she complained to Sanders about the "old lady" remarks. Coleman testified as follows regarding her complaint to Sanders:

> A.   Sometimes comments might have been made [by Sanders] like, "Well, you're an old lady and that's all you can handle." . . . .
>
> * * * *
>
> Q:   Did you speak with Mr. Sanders about that? Did you tell him that you were offended?
>
> A:   I may have in occasion or in passing.
>
> Q:   Did he continue to do that after you spoke to him about that?
>
> A:   Probably not. Probably not, no.

Coleman Dep. at 158-159. This complaint, which Coleman "may have" made "in passing," does not satisfy the standard for protected activity under the ELCRA because it did not "clearly convey" to FedEx that Coleman was "raising the specter of a claim of unlawful discrimination pursuant to the [EL]CRA." *See Barrett*, 245 Mich. App. at 319. Moreover, and alternatively, Sanders testified that Coleman "never told [him] that she was offended by anything [he] had said." Sanders Decl. ¶ 10. Coleman testified that she "may have" complained to Sanders. Coleman Dep. at 159. Coleman's qualified testimony that she "may have" complained to Sanders is probably insufficient to rebut Sanders' absolute testimony that Coleman did not complain. In any event, regardless of whether a jury would credit Sanders' version of the facts or Coleman's version of the facts on the question of whether a complaint was made to Sanders in the first place, there is clearly no protected activity in this case. Coleman's retaliation claim fails.[10]

---

[10] Alternatively, even if her complaint to Sanders constitutes protected activity, the Court notes that Sanders did not make the decision to terminate Coleman's employment because he was on vacation at the time. *See* Sanders Decl. ¶ 8. The decision was made, instead, by

## V. CONCLUSION

The circumstances surrounding Coleman's termination are unfortunate. It may well be that Coleman acted in good faith with the belief that her actions were in compliance with FedEx policy. Moreover, the Court has no reason to doubt that Coleman reported her license suspension when she discovered it in June 2007, and that she did not knowingly operate a FedEx vehicle from March 28, 2007, until June 5, 2007, on a suspended license. However, FedEx reporting policies appear to be strict liability policies, as evidenced by not only the disciplinary actions taken against Coleman, but also the disciplinary actions taken against Rodriguez. The bottom line is that Coleman operated a FedEx vehicle, for a long time, on a suspended license. This was Coleman's second violation. Under its policies, FedEx was entitled to discipline Coleman as it saw fit, "up through immediate termination," as Wisely cautioned in his warning letter to Coleman on August 1, 2003, in response to Coleman's first offense. Coleman's termination was, at most, unfair since, taking the facts in the light most favorable to Coleman, she acted in good faith. However, because there is no evidence that her termination was driven by any improper motive, the decision to terminate her employment was not illegal. FedEx is entitled to summary judgment, and this case is dismissed.

SO ORDERED.


S/Paul D. Borman                                   
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

---

McCormick after consulting with Bill, Hickman, Stern, and Mattei. *See* McCormick Decl. ¶ 9. Coleman presents no evidence that McCormick or any of the others with whom he consulted knew that Coleman had previously complained to Sanders about being called an "old lady." Thus, Coleman has not shown that the decisionmakers knew of her protected activity and, accordingly, cannot satisfy elements (2) and (4) of the *Garg* framework.

Dated:  August 2, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on August 2, 2010.


      S/Denise Goodine_____
      Case Manager